FILED

2021 Jul-29 PM 01:08
U.S. DISTRICT COURT
N.D. OF ALABAMA

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | | |
|---|---|---|
| **ERIC ROBERT RUDOLPH,** | ) | |
| | ) | |
| **Petitioner,** | ) | |
| | ) | |
| **vs.** | ) | **Civil Action No. 2:20-cv-08024-CLS** |
| | ) | **(Criminal Case No. CR-00-S-0422-S)** |
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| **Respondent.** | ) | |

## MEMORANDUM OPINION

Eric Robert Rudolph pled guilty in this court on April 13, 2005, to both counts of an indictment charging him, in Count One, with maliciously damaging by means of an explosive a building and property used in an activity affecting interstate commerce, thereby causing the death of one person and inflicting severe personal injuries on another, in violation of 18 U.S.C. § 844(i); and, in Count Two, with knowingly using a destructive device during the crime of violence charged in Count One, in violation of 18 U.S.C. § 924(c)(1). He was sentenced to consecutive life sentences on July 18, 2005.[1] He now is back before the court after filing, on June 22, 2020, a motion under 28 U.S.C. § 2255 to vacate, correct, or set aside his sentence for the offense alleged in Count Two. His motion is based upon the Supreme Court's

---

[1] *See* Criminal Case No. CR 00-S-0422-S, doc. no. 556 (Transcript of July 18, 2005 Sentencing Proceeding) and doc. no. 559 (July 20, 2005 Written Judgment).

decision in *United States v. Davis*, 139 S. Ct. 2319 (2019), holding that the definition of the term "crime of violence" contained in 18 U.S.C. § 924(c)(3)(B) is unconstitutionally vague and, therefore, void. *See* doc. no. 1 (Motion to Vacate Sentence).[2]

This court stayed these proceedings, pending the Supreme Court's ruling in *Borden v. United States*, 141 S. Ct. 1817 (2021): a case that raised the question of whether a defendant's prior conviction for an offense that required a "mens rea" (subjective mental state)[3] of "recklessness" qualified as a "violent felony" under the "elements clause" of the Armed Career Criminal Act, 18 U.S.C. § 924(e)(2)(B)(i).[4] The answer to that question is important, in view of Rudolph's argument that the offense of arson charged in Count One cannot serve as the predicate (or basis) for the § 924(c)(1) offense alleged in Count Two, because conviction for arson requires proof that a defendant "maliciously" damaged property with a destructive device, and a mens rea of "maliciousness" does not require proof of "intentional conduct," but

---

[2] Subsection 924(c)(3)(B) of this statute is generally referred to as the "residual clause."

[3] "Mens rea" is a Latin phrase meaning "guilty mind," and it serves as a concise reference to the subjective state of mind that the prosecution, in order to convict, must prove that a defendant possessed when committing a particular crime. *See Mens Rea*, Black's Law Dictionary 1075 (9th ed. 2009) (Bryan A. Garner, Ed.).

[4] The elements clause of the Armed Career Criminal Act defines the term "violent felony" as "any crime punishable by imprisonment for a term exceeding one year . . . that . . . has as an element the use, attempted use, or threatened use of physical force against the person of another[.]" 18 U.S.C. § 924(e)(2)(B)(i).

can be satisfied by some degree of "recklessness." *See* doc. no. 14 (Petitioner Rudolph's Reply), at 19–22. The Supreme Court issued its ruling in *Borden* on June 10, 2021, and held that a criminal offense requiring a mens rea of "recklessness" does not qualify as a "violent felony" under the elements clause of the Armed Career Criminal Act. *Borden v. United States*, 141 S. Ct. 1817, 1821–22 (2021).[5] The remainder of this opinion evaluates Rudolph's motion in light of the Supreme Court's holdings in *Davis* and *Borden*.

## I. RUDOLPH'S INDICTMENT

**A.** **Count One of the Superseding Indictment**: *malicious damage of property with an explosive*

> On or about the 29th day of January, 1998, in Jefferson County, within the Northern District of Alabama, the defendant, ERIC ROBERT RUDOLPH, did maliciously damage, by means of an explosive, a building and property used in an activity affecting interstate and foreign commerce, namely the New Woman All Women Health Care Clinic located at 1001 17th Street South in Birmingham, Alabama, which prohibited conduct resulted in the death of Robert D. Sanderson and personal injury to Emily Lyons, in violation of Title 18, United States Code, Section 844(i).

Criminal Case No. CR 00-S-0422-S, doc. no. 17 (Superseding Indictment), at 1. The

---

[5] As Justice Kagan stated at the beginning of her plurality opinion in *Borden*, the Armed Career Criminal Act mandated "a 15-year minimum sentence for persons found guilty of illegally possessing a gun who have three or more prior convictions for a 'violent felony.' The question here is whether a criminal offense can count as a 'violent felony' if it requires only a mens rea of recklessness — a less culpable mental state than purpose or knowledge. We hold that a reckless offense cannot so qualify." *Borden v. United States*, 141 S. Ct. 1817, 1821–22 (2021) (plurality opinion).

statute upon which Count One is based defines the federal offense of arson as "maliciously" damaging or destroying "by means of *fire* or an *explosive*, any . . . property used in interstate or foreign commerce or in any activity affecting interstate or foreign commerce." 18 U.S.C. § 844(i) (emphasis supplied).[6]

The Grand Jury elaborated Count One by adding the following "special findings" to the Superseding Indictment:[7]

### NOTICE OF SPECIAL FINDINGS

The allegations of Count One of this Indictment are hereby realleged as if fully set forth herein and incorporated by reference. With regard to Count One of this Indictment, the Grand Jury makes the following special findings:

1. The defendant, ERIC ROBERT RUDOLPH, was 18 years of age or older at the time of the offense. (18 U.S.C. § 3591(a)[[8]]).

---

[6] Specifically, the full text of the federal arson statute reads as follows:

(i) Whoever *maliciously* damages or destroys, or attempts to damage or destroy, by means of fire *or an explosive*, any building, vehicle, or other real or personal property *used in interstate or foreign commerce or in any activity affecting interstate or foreign commerce* shall be imprisoned for not less than 5 years and not more than 20 years, fined under this title, or both; and if personal injury results to any person, including any public safety officer performing duties as a direct or proximate result of conduct prohibited by this subsection, shall be imprisoned for not less than 7 years and not more than 40 years, fined under this title, or both; and *if death results to any person*, including any public safety officer performing duties as a direct or proximate result of conduct prohibited by this subsection, shall also be subject to imprisonment for any term of years, *or to the death penalty or to life imprisonment*.

18 U.S.C. § 844(i) (emphasis supplied).

[7] The original indictment (doc. no. 1 in Criminal Case No. CR-00-S-0422-S) also contained two Counts based upon the same statutes, but did not include the "Special Findings" quoted in text.

[8] 18 U.S.C. § 3591(a) specifies the criteria that must be considered before a death sentence may be imposed, and dictates that no person may be sentenced to death unless it is determined,

2. The defendant, ERIC ROBERT RUDOLPH,:

    a. intentionally killed the victim. (18 U.S.C. § 3591(a)(2)(A));

    b. intentionally inflicted serious bodily injury that resulted in the death of the victim. (18 U.S.C. § 3591(a)(2)(B)).

    c. intentionally participated in an act, contemplating that the life of a person would be taken or intending that lethal force would be used in connection with a person, who died as a direct result of the act. (18 U.S.C. § 3591(a)(2)(C)).

    d. intentionally and specifically engaged in an act of violence, knowing that the act created a grave risk of death to a person and constituted a reckless disregard for human life and the victim died as a direct result of the act. (18 U.S.C. § 3591(a)(2)(D)).

3. The defendant, ERIC ROBERT RUDOLPH,:

    a. during the commission of an offense under section 844(i), as alleged herein, caused the death of and injuries resulting in the death of a person. [18 U.S.C. § 3592(c)(1)[9]].

    b. in the commission of the offense, knowingly created a grave risk of death to one or more persons in addition to

---

beyond a reasonable doubt, at a hearing conducted in accordance with 18 U.S.C. § 3593 that the offender was at least 18 years of age on the date of the offense, and that the criteria specified in textual paragraphs 2.a through 2.d following this footnote are satisfied.

    [9] 18 U.S.C. § 3592(c) states that, when "determining whether a sentence of death is justified for an offense described in [18 U.S.C. §] 3591(a)(2), the jury . . . shall consider each of the following aggravating factors for which notice has been given and determine which, if any, exist." Subsection 3592(c)(1) addresses the aggravating circumstance of a death that occurs during the commission of another crime, and provides (in the portion here pertinent) that: "The death, or injury resulting in death, occurred during the commission or attempted commission of, or during the immediate flight from the commission of, an offense under . . . [18 U.S.C. §] 844(i) (destruction of property affecting interstate commerce by explosives)[.]"

the victim of the offense.  [18 U.S.C. § 3592(c)(5)[10]].

  c. committed the offense in an especially heinous, cruel and depraved manner in that it involved torture or serious physical abuse to the victims.  [18 U.S.C. § 3592(c)(6)[11]].

  d. committed the offense after substantial planning and premeditation to cause the death of a person or commit an act of terrorism.  [18 U.S.C. § 3592(c)(9)[12]].

  e. intentionally attempted to kill more than one person in a single criminal episode. [18 U.S.C. § 3592(c)(16)[13]].

Criminal Case No. CR 00-S-0422-S, doc. no. 17 (Superseding Indictment), at 2–3

(Notice of Special Findings) (footnotes supplied).

**B. Count Two of the Superseding Indictment**:  *use of a destructive device during and in relation to the crime of violence charged in Count One*

  On or about the 29th day of January, 1998, in Jefferson County, within the Northern District of Alabama, the defendant, ERIC ROBERT RUDOLPH, *knowingly* used *a firearm, that is a destructive device,*

---

[10] Subsection 3592(c)(5) addresses the aggravating factor of a criminal act that gives rise to a "Grave risk of death to additional persons," and provides that:  "The defendant, in the commission of the offense, or in escaping apprehension for the violation of the offense, knowingly created a grave risk of death to 1 or more persons in addition to the victim of the offense."

[11] Subsection 3592(c)(6) addresses the aggravating factor of a criminal offense that is committed in a "Heinous, cruel, or depraved manner," and provides that:  "The defendant committed the offense in an especially heinous, cruel, or depraved manner in that it involved torture or serious physical abuse to the victim."

[12] Subsection 3592(c)(9) addresses the aggravating factor that arises when it is shown that "The defendant committed the offense after substantial planning and premeditation to cause the death of a person or commit an act of terrorism."

[13] Subsection 3592(c)(16) addresses the aggravating factor of "Multiple killings or attempted killings"; that is, when it is shown that "The defendant intentionally killed or attempted to kill more than one person in a single criminal episode."

during and in relation to *a crime of violence* for which he may be prosecuted in a Court of the United States, *that is the damage to a building and property used in an activity affecting interstate and foreign commerce, as described above in Count One*, and in the course of such conduct *caused the death of Robert D. Sanderson* through the use of said firearm, in violation of Title 18, United States Code, Section 924(c)(1).

*Id*. at 1–2 (emphasis supplied).[14]

## II. RUDOLPH'S PLEA AGREEMENT

Rudolph executed a binding Plea Agreement on April 4, 2005,[15] and subsequently entered pleas of "guilty" to both Counts of the Superseding Indictment. He explicitly admitted his actual guilt of the offenses charged, surrendered his right to a trial by jury, and waived his rights to appeal or collaterally attack his convictions

---

[14] The relevant portions of the statute upon which Count Two is based read as follows:

(A)  Except to the extent that a greater minimum sentence is otherwise provided by this subsection or by any other provision of law, any person who, during and in relation to any *crime of violence* or drug trafficking crime (including a *crime of violence* or drug trafficking crime that provides for an enhanced punishment if committed by the use of a deadly or dangerous weapon or device) for which the person may be prosecuted in a court of the United States, uses or carries a *firearm*, or who, in furtherance of any such crime, possesses a *firearm*, shall, in addition to the punishment provided for such *crime of violence* or drug trafficking crime—

* * * *

(B)   If the *firearm* possessed by a person convicted of a violation of this subsection— . . . (ii) is a . . . *destructive device*, . . . the person shall be sentenced to a term of imprisonment of not less than 30 years.

18 U.S.C. § 924(c)(1)(A) & § 924(c)(1)(B)(ii) (emphasis supplied).

[15] *See* Criminal Case No. CR 00-S-0422-S, doc. no. 537 (Plea Agreement).

7

and sentences.  In return, the Government withdrew its notice of intent to seek the

death penalty,[16] and agreed that Rudolph should be sentenced to consecutive terms

of life imprisonment.[17]

Rudolph stipulated that the Government's evidence at trial would prove the

facts set forth in the following Statement of Facts, and admitted that those facts would

"establish his guilt beyond a reasonable doubt."[18]

> Eric Robert Rudolph served in the United States Army between 1987 and 1989.  According to several Army witnesses, he received training in improvised or field explosive devices.  Both during and after his Army service, Rudolph possessed military manuals concerning conventional military explosives.

> At various times Eric Rudolph used alias names.  One such alias was "Z. Randolp."  On February 9, 1996, using this alias, Rudolph bought a postal money order which he used in an attempt to purchase a manual entitled "Kitchen Improvised Fertilizer Explosives."  This manual was never sent to Rudolph.  About one month later, Rudolph, using the same alias, ordered a different manual entitled "Ragnar's Homemade Detonators."  Rudolph did receive this manual, which detailed how to construct a detonator for initiating high explosives, including dynamite.

### The Birmingham Bombing

On Thursday, January 29, 1998, at 7:32 a.m. Central Standard

---

[16] *Compare id.*, doc. no. 79 (Notice of Intent to Seek the Death Penalty) *with id.*, doc. no. 537 (Plea Agreement), ¶ 6, at 3 ("Although the statutes of conviction, 18 U.S.C. § 844(i) and 924(c), provide for a maximum penalty of death upon the Government's notice of intent to seek the death penalty, the Government agrees to withdraw such notice filed on December 11, 2003.").

[17] *Id.*, doc. no. 537 (Plea Agreement), ¶ 6, at 3.

[18] *Id.* ¶ 3, at 2.

Time (CST), a bomb exploded in front of the New Woman All Women Health Care Clinic, a health clinic that performs abortions, in Birmingham, Alabama. The bomb had been buried under shrubbery next to the walkway leading up to the clinic, and further concealed under an artificial plant.

The bomb exploded as Robert Sanderson, a Birmingham Police officer working security at the clinic, leaned over it, killing him. The autopsy on the body of Officer Sanderson indicated that his death was a result of the thermal and concussion effect of the blast from the device. The clinic's head nurse, Emily Lyons, who was standing nearby, was seriously and permanently injured. The explosion also caused extensive damage to the building and property used in interstate commerce or used in activities affecting interstate commerce.

Eric Robert Rudolph had constructed and placed this bomb outside the New Woman All Women Health Care Clinic and it was detonated by radio remote control as Officer Sanderson stood over it.

The bomb contained dynamite as the explosive, and Eveready batteries as the power source. The bomb contained a Radio Shack plastic battery holder, and a Rubbermaid Servin'Saver clear plastic container with an almond-colored lid. Gray duct tape and black plastic electrical tape also were in this bomb. Over five and one-half pounds of nails were in this bomb as shrapnel. The Birmingham bomb was inside a locked tool box, covered with green plastic foliage.

Just after the blast, a witness saw a white male walking calmly away from the vicinity of the explosion, as everyone else in the area rushed towards it. The witness thought that was suspicious, and he followed the man. After a while, the man ducked behind an apartment building and emerged having changed his appearance by taking off his baseball cap and jacket. The witness continued to follow the man for some distance, but eventually lost him. The witness then stopped at a McDonald's Restaurant to call 911.

As the witness was on the telephone with the 911 operator, he

9

observed through the window of the McDonald's the same man he had been following earlier walking along the opposite side of the street. As the witness was telling the 911 operator what he was seeing, a customer in the McDonald's observed what was occurring and called out a physical description of the white male to the witness, who relayed it to the 911 operator. He described the individual as a white male, 5'11" to 6' tall, approximately 180 pounds, collar-length dark hair, approximately 35 years old — a description consistent with Rudolph — wearing a black baseball cap, a green and black plaid short-sleeve shirt layered over a long-sleeve black shirt and wearing a black backpack, which appeared full.

After providing the description, the first and second witnesses left the restaurant to follow the man. The second witness eventually saw the man placing something in the back of a gray Nissan pickup truck with a camper shell, and recorded the truck's license tag — North Carolina plate number KND1117. When the witness stopped to give the information to the police, he lost sight of the truck. After Rudolph's photo was publicized by the media in February 1998, this witness contacted ATF agents and told them that he had seen the photograph in the media of the person who was being sought as a material witness. He stated that he was certain the person in the picture was the person he had seen driving the pickup truck on the day of the bombing. The photograph was of Eric Rudolph.

Shortly after the second witness observed the truck, the first witness saw the gray Nissan pickup with camper shell being driven by the same white male he had been following earlier. The witness made a U-turn and followed the truck. Independently of the second witness, the first witness recorded the license plate number as North Carolina license number KND1117. He subsequently lost the truck in traffic.

Alabama State Troopers traced North Carolina license plate number KND1117 to a vehicle registered to Eric Rudolph with an Asheville, North Carolina address. The address, however, was his mother's old address. While agents tried to locate Rudolph's current residence, Rudolph returned to Murphy, North Carolina, where his truck

was seen turning into his driveway at about 4:30 p.m. Eastern Standard Time (EST). Murphy is about a 5-hour drive from Birmingham.

That evening Rudolph was seen in a video store in town, and on Friday morning, January 30, 1998, he returned the video and rented another. That afternoon, he stopped by a grocery store and returned to his trailer.

At about 5:00 p.m. EST on January 30, 1998, the Birmingham U.S. Attorney's Office obtained an arrest warrant for Rudolph, and a news conference was held to announce that Rudolph was wanted as a material witness to the clinic bombing. Given the national media coverage of the news conference, Rudolph quickly learned that he had been identified as a suspect in the bombing. Rudolph bought dinner at a Burger King and went to a grocery store where he purchased a large quantity of oatmeal, canned goods, batteries, and other camping supplies. Agents arrived at Rudolph's trailer between 8:00 and 9:00 p.m. that evening. They found the heat on, the lights on and the front door standing open, but Rudolph was gone. Rudolph had fled into the mountains of western North Carolina to hide.

Within hours of the Birmingham clinic bombing, two letters were mailed from the Birmingham area to two Atlanta print media outlets. The letters were essentially identical, handwritten separately in disguised block printing, with a black felt-tip pen on lined paper. The letters claimed responsibility for the Birmingham clinic bombing on behalf of the "Army of God," and threatened more violence in the future against abortion supporters and anyone associated with the drug RU-486. The Army of God letters concluded with the phrase "DEATH TO THE NEW WORLD ORDER" and the code "4-1-9-9-3."

Beginning on February 2, 1998, agents executed a series of search warrants for Rudolph's trailer and storage unit. Eight days after Rudolph disappeared, on February 7, 1998, his Nissan truck was found abandoned in a heavily wooded area outside Murphy, North Carolina. Agents executed a search warrant for the truck.

11

During searches of Rudolph's trailer, agents found residue of nitroglycerin dynamite in numerous locations, including: the carpet; two baseball caps; cushioning from a rocking chair; a rented VCR tape and cover; a bed sheet from Rudolph's bed; and a pair of gray socks. Dynamite residue also was found on the steering wheel cover and a paper grocery bag in Rudolph's abandoned Nissan truck.

An examination of latent fingerprints found inside the truck revealed that all identifiable latent fingerprints belonged to Rudolph. Agents also recovered latent fingerprints belonging to Rudolph from the driver's side seat belt buckle. There were no latent fingerprints belonging to anyone else in the truck. One latent print not belonging to Rudolph was found on the inside tailgate of the truck.

During the autopsy on Officer Sanderson's body, doctors removed two pieces of metal that were identified as pieces of a hose clamp. Agents traced numbers on one of the pieces to identify it as part of a hose clamp marketed under the brand name "Popular Mechanics." Popular Mechanics hose clamps were sold exclusively at WalMart. During the search of Rudolph's trailer, agents discovered a receipt that shows the purchase of a set of two hose clamps at the Murphy Wal-Mart on December 24, 1997. The hose clamps are the same type as those found in Officer Sanderson's body. No hose clamps of that type were found in the search of Rudolph's trailer, truck or storage unit.

A piece of crystal was removed from Emily Lyon's body. This type of crystal has been identified as one used in a radio remote controlled device, like the ones used to fly radio remote controlled airplanes. A piece of a circuit board belonging to a JR 6000 remote control unit was found on the roof of a building adjacent to the New Woman All Women Health Care clinic. Other pieces found at the bomb site are consistent with the JR 6000 remote control unit, including a servo and a plastic battery pack. Explosives experts will testify that based upon this evidence, the bomb could have been detonated by remote control.

After the material witness warrant was issued in Birmingham on

January 30, 1998, Eric Robert Rudolph remained a fugitive for approximately five years. He was arrested in Murphy, North Carolina in the early morning hours of May 30, 2003 by local law enforcement.

Criminal Case No. CR 00-S-0422-S, doc. no. 537 (Plea Agreement), at 10–13.

## III. THE RELIEF SOUGHT BY RUDOLPH

As noted, Count Two of Rudolph's indictment was based upon 18 U.S.C. § 924(c)(1), which allowed additional and more severe penalties for his use of "a firearm, that is a destructive device," when committing the "crime of violence" charged in Count One. "Crime of violence" is defined two ways in subsection 924(c)(3):

> (3) For purposes of this subsection the term "*crime of violence*" means *an offense that is a felony* and —
>
> (A) has *as an element* the use, attempted use, or threatened use of physical force against the person or property of another [*generally referred to as the* "**elements clause**"], *or*
>
> (B) that *by its nature*, involves *a substantial risk* that physical force against the person or property of another may be used in the course of committing the offense [*generally referred to as the* "**residual clause**"].

18 U.S.C. § 924(c)(3) (all emphasis and bracketed alterations supplied).

The Supreme Court construed subsection 924(c)(3)(B), the so-called "residual clause," in *United States v. Davis*, 139 S. Ct. 2319 (2019), and held that its definition of a "crime of violence" was unconstitutionally vague and, therefore, void. *See id.*

13

at 2336.

Rudolph contends that the term "crime of violence," as used in reference to the predicate offense of arson charged in Count One, was defined by the "residual clause" of subsection 924(c)(3)(B), and that his conviction and sentence for the offense charged in Count Two must, in accordance with *Davis*, be vacated as unconstitutional.

He also contends that the sentences for *both Counts* of his indictment were negotiated and imposed as "a package," and that this court accordingly must

> set the case for resentencing as to **count 1**. At that hearing, the parties should have an opportunity to agree on a sentence as to **count 1**, consistent with [the parties' binding plea agreement entered pursuant to Federal Rule of Criminal Procedure] 11(c)(1)(C). If the parties cannot agree upon a sentence or if the Court does not accept the agreement, Mr. Rudolph should have the opportunity to withdraw his plea, consistent with Rule 11(c)(5)(B).

Doc. no. 14 (Petitioner Rudolph's Reply), at 29 (all emphasis and bracketed alterations supplied).

## IV. DISCUSSION

Rudolph's motion potentially presents as many as four issues. *First*, was it timely? If so, then: *Secondly*, which party bears the burden of proof? *Thirdly*, did Rudolph's conviction under Count Two rest upon the "elements" or "residual" clause of 18 U.S.C. § 924(c)(3)? *Finally*, if the latter, do the appeal and collateral attack

14

waiver provisions contained in Rudolph's binding plea agreement bar him from seeking under § 2255 the relief described in the previous section?

## A. The Timeliness of Rudolph's Motion

Following the Supreme Court's decision in *Davis*, the Eleventh Circuit held that the new, substantive rule announced in that case should be applied retroactively. *In re Hammoud*, 931 F.3d 1032, 1038–39 (11th Cir. 2019).

Motions made under 28 U.S.C. § 2255 have a one-year limitation period that runs from "the date on which the right asserted was initially recognized by the Supreme Court, if that right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review." 28 U.S.C. § 2255(f)(3).

The decision in *Davis* was issued on June 24, 2019. Rudolph filed his motion to vacate on June 22, 2020.[19] Therefore, his motion was timely.

## B. The Burden of Proof

Numerous Eleventh Circuit cases, as well as binding authorities from the former Fifth Circuit,[20] hold that a § 2255 movant "bears the burden to prove the claims in his § 2255 motion." *Beeman v. United States*, 871 F.3d 1215, 1222 (11th Cir. 2017) (citing *Rivers v. United States*, 777 F.3d 1306, 1316 (11th Cir. 2015)); *see*

---

[19] *See* doc. no. 1 (Pro Se Motion to Vacate).

[20] The Eleventh Circuit adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to the close of business on September 30, 1981, in *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (*en banc*).

*also*, *e.g.*, *LeCroy v. United States*, 739 F.3d 1297, 1321 (11th Cir. 2014); *Barnes v. United States*, 579 F.2d 364, 366 (5th Cir. 1978) ("Under Section 2255, [the movant] had the burden of showing that he was entitled to relief.") (alteration supplied); *Coon v. United States*, 441 F.2d 279, 280 (5th Cir. 1971) ("A movant in a collateral attack upon a judgment has the burden to allege and prove facts which would entitle him to relief.").

More recently, the Eleventh Circuit held in *Weeks v. United States*, 930 F.3d 1263 (11th Cir. 2019), that a § 2255 movant raising a claim under the Supreme Court's opinion in *Johnson v. United States*, 135 S. Ct. 2551 (2015), which invalidated the residual clause of the Armed Career Criminal Act, "bears the burden of showing, more likely than not, that 'it was use of the residual clause that led to the sentencing court's enhancement of his sentence.'" *Weeks*, 930 F.3d at 1271 (quoting *Beeman*, 871 F.3d at 1221–22). The motion "fails '[i]f it is just as likely that the sentencing court relied on the elements or enumerated offenses clause, solely or as an alternative basis for the enhancement.'" *United States v. Pickett*, 916 F.3d 960, 963 (11th Cir. 2019) (quoting *Beeman*, 871 F.3d at 1222) (alteration in original). Because *Johnson* and *Davis* invalidated materially identical residual clauses, the same burden applied in challenges based upon the *Johnson* opinion will be applied here, and Rudolph bears the burden of proof on his § 2255 motion.

**C.    The Predicate Offense**: *Was "crime of violence" defined by the elements clause, or by the residual clause, of 18 U.S.C. § 924(c)(3)?*

If the term "crime of violence" as used in reference to the federal arson offense charged in Count One was defined by the "elements clause" of 18 U.S.C. § 924(c)(3)(A), the Supreme Court's decision in *United States v. Davis* would not apply, and Rudolph's § 2255 motion would be due to be dismissed as a matter of law.

When determining whether the § 844(i) arson offense constitutes a "crime of violence" under the elements clause, the court must employ the so-called "categorical approach." *See Brown v. United States*, 942 F.3d 1069, 1075 (11th Cir. 2019) ("We apply the categorical approach when determining whether an offense constitutes a 'crime of violence' under the elements clause.").

**1.    The "categorical approach"**

A defendant's actual conduct when committing the offense in question is not relevant when applying the categorical approach, because the court is required to determine only whether the predicate crime "has *as an element* the use, attempted use, or threatened use of physical force against the person or property of another." 18 U.S.C. § 924(c)(3)(A) (emphasis supplied); *see also Mathis v. United States*, 136 S. Ct. 2243, 2251 (2016) (holding that a "sentencing judge may look only to 'the elements of the [offense], not to the facts of [the] defendant's conduct'") (quoting

17

*Taylor v. United States*, 495 U.S. 575, 601 (1990)) (alterations in original).

Accordingly, this court cannot look at the evidence of Rudolph's actual conduct summarized in Part II, *supra*, but must instead presume that his conviction for the federal offense of arson "rested upon the 'least of the acts criminalized' by the statute." *United States v. Oliver*, 962 F.3d 1311, 1316 (11th Cir. 2020) (citing *Moncrieffe v. Holder*, 569 U.S. 184, 190–91 (2013)).

Rudolph argues that, under the categorical approach, the § 844(i) arson offense cannot be deemed a "crime of violence" under subsection 924(c)(3)(A)'s elements clause. His argument is based upon two contentions. First, he argues that the arson statute, which has a mens rea of *maliciousness*, is broader than subsection 924(c)(3)(A)'s elements clause, which refers solely to *intentional* conduct, because "maliciousness" encompasses both "intentional" and "reckless" acts.

Second, he argues that subsection 924(c)(3)(A)'s elements clause requires proof that physical force was used "against the person or property *of another*," but the "least of the acts criminalized" by the arson statute includes a crime committed by a defendant against *his own property*. *See, e.g.*, *Russell v. United States*, 471 U.S. 858, 859 (1985) (involving the prosecution under 18 U.S.C. § 844(i) of a defendant who attempted to set fire to his own apartment building).

      a.     *The elements of proof for the predicate offense of arson* ("crime

18

of violence") *charged in Count One*

The pattern jury instructions in effect within the Eleventh Circuit on April 13, 2005, the date on which Rudolph entered his pleas of guilty, state that a defendant could be convicted of arson under 18 U.S.C. § 844(i) only if the Government proved at least the following three facts beyond a reasonable doubt:[21]

> First: That the Defendant [damaged] [destroyed] [attempted to damage or destroy] a [building] [vehicle] [other real or personal property] as described in the indictment by means of a [fire] [explosive], as charged.
>
> Second: That *the Defendant acted intentionally or with willful disregard of the likelihood that damage or injury would result from* [his] [her] *acts.*
>
> Third: That the [building] [vehicle] [other real or personal property] that was [damaged] [destroyed] [attempted to be damaged or destroyed] by the Defendant, was used [in interstate or foreign commerce] [in any activity affecting foreign or interstate commerce].

Eleventh Circuit Pattern Jury Instructions – Criminal Cases, *Offense Instruction* 28, at 189 (2003) (bracketed text in original, italicized emphasis supplied).[22]

---

[21] In Rudolph's case, the Government also was required to prove a fourth element: "that Robert D. Sanderson died, and Emily Lyons sustained personal injuries, as a direct and proximate result of [Rudolph's] actions." Criminal Case No. CR 00-S-0422-S, doc. no. 543 (Transcript of Plea Colloquy), at 25–26 (describing Government's burden of proof) (alteration supplied).

[22] The 2010 Revisions to the Eleventh Circuit Patterns, as well as the 2020 Revisions currently in effect, are identical to the instructions quoted in text, except in one respect: *that is*, "deliberate" is substituted for "willful" in the second element, which now requires the Government to prove that "the Defendant acted intentionally or with ***deliberate*** disregard of the likelihood that damage or injury would result from [his] [her] acts." *See* Eleventh Circuit Pattern Jury Instructions — Criminal Cases, *Offense Instruction* O28, at 209 (2020); Eleventh Circuit Pattern Jury Instructions

b.  *The definition of "maliciously" as used in § 844(i)*

The members of the 2003 Pattern Jury Instruction Committee formulated the

second element of proof quoted in the preceding section to reflect their understanding

of what Congress intended when using the term "maliciously" in 18 U.S.C. § 844(i).[23]

The Comments to the 2003 Patterns state that the Committee's formulation was based

upon the Fourth Circuit's opinion in *United States v. Gullett*, 75 F.3d 941 (4th Cir.

1996), holding that the term "maliciously" was "comparable to the common law

definition of malice,[24] and 'is satisfied if the defendant acted intentionally or with

willful disregard of the likelihood that damage or injury would result from his or her

acts.'"  Eleventh Circuit Pattern Jury Instructions – Criminal Cases, *Committee*

*Annotations and Comments to Offense Instruction 28*, at 190 (2003 Revision)

---

— Criminal Cases, *Offense Instruction* 28, at 198 (2010).

 The Comments to the 2010 Revisions state that the Pattern Jury Committee "avoided the use
of 'willful' because of possible confusion with Basic Instruction 9.1A," which defines the word
"willfully" as meaning that the defendant's act "was committed voluntarily and purposely, with the
intent to do something the law forbids; that is, with the bad purpose to disobey or disregard the law.
While a person must have acted with the intent to do something the law forbids before you can find
that the person acted 'willfully,' the person need not be aware of the specific law or rule that [his]
[her] conduct may be violating."  Eleventh Circuit Pattern Jury Instructions – Criminal Cases, *Basic
Instruction* 9.1A, at 35 (2010 Revisions).

 [23] *See* note 6, *supra*, for the text of 18 U.S.C. § 844(i).

 [24] "Common law malice" is defined by the Eleventh Circuit as "ill will," and is usually
discussed in contrast to actual or constitutional malice in defamation cases.  *See, e.g., Straw v. Chase
Revel, Inc.*, 813 F.2d 356, 362 (11th Cir. 1987) ("'[M]alice' means ill will."); *see also, e.g., Cantrell
v. Forest City Publishing Co.*, 419 U.S. 245, 252 (1974) ("[C]ommon-law malice [is] frequently
expressed in terms of either personal ill will toward the plaintiff or reckless or wanton disregard of
the plaintiff's rights.") (alterations supplied); *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 370 (1974)
(White, J., dissenting) (discussing "malice in the traditional sense of ill will").

20

(quoting *Gullett*, 75 F.3d at 948) (footnote supplied). *See also United States v. Morrison*, 218 F. App'x 933, 940–41 (11th Cir. 2007) ("Although § 844(i) does not define the term 'maliciously,' several circuits have specifically held that, based on common law and the legislative history of the statute, the term includes acts done 'intentionally or with willful disregard of the likelihood that damage or injury would result.'") (quoting *United States v. Wiktor*, 146 F.3d 815, 818 (10th Cir. 1998) (*per curiam*)).

The Fourth and Eleventh Circuit definitions of "maliciously" as acting "intentionally, or with willful [or deliberate[25]] disregard [for] the likelihood that damage or injury would result from" the defendant's use of fire or an explosive to damage any building or real or personal property used in interstate commerce is consistent with that of at least five other circuits. *See, e.g.*, *McFadden v. United States*, 814 F.2d 144, 146 (3d Cir. 1987) (adopting the common law definition of "maliciously" as acting "intentionally or with willful disregard of the likelihood that damage or injury would result"); *United States v. Monroe*, 178 F.3d 304, 307 (5th Cir. 1999) ("'[M]aliciously' for purposes of § 844(i) means 'acting intentionally or with willful disregard of the likelihood that damage or injury would result.'") (alteration

---

[25] See note 22, *supra*, explaining the basis for the substitution of "deliberate" for "willful" in the second element of the 2010 and 2020 Revisions of the pattern jury instructions for the federal offense of arson.

supplied); *United States v. Grady*, 746 F.3d 846, 848–50 (7th Cir. 2014) (upholding a jury instruction defining "maliciously" as acting "intentionally or with deliberate disregard of the likelihood that damage or injury will result"); *United States v. Whaley*, 552 F.3d 904, 907 (8th Cir. 2009) (defining "maliciously" as acting "with willful disregard of the likelihood that damage or injury would result"); *United States v. Wiktor*, 146 F.3d 815, 818 (10th Cir. 1998) (upholding a jury instruction based on the definition of "maliciously" as acting "intentionally or with willful disregard of the likelihood that damage or injury would result"). *See also Carlon-Bonilla v. Barr*, 825 F. App'x 488, 489 (9th Cir. 2020) (citing many of the cases listed above, and explicitly joining those courts in their definition of "maliciously" as including acts "done in willful disregard of the likelihood that property damage would result").

        **c.**    *"Maliciously" and the elements clause of subsection 924(c)(3)(A)*

"Maliciously," as defined by the Circuit Court decisions referenced in the preceding subsection, includes a mens rea of "recklessness." *See United States v. Tsarnaev*, 968 F.3d 24, 101 (1st Cir. 2020) ("[T]he parties agree (or at least do not dispute) that 'maliciously' there includes both intentional and reckless acts.") (alteration supplied) (citing *Grady*, 746 F.3d at 848–49 (adopting the foregoing definition, and collecting cases from the Third, Fourth, Fifth, and Tenth Circuits holding that "maliciously" includes recklessness)).

Accordingly, the mens rea element of the federal arson statute can be satisfied by either intentional or reckless conduct.

Thus, the issue before this court becomes: *can an offense with a mens rea requirement of* "maliciously," *which includes* "recklessness," *satisfy the elements clause found at 18 U.S.C. § 924(c)(3)(A)?* The Supreme Court answered that question in *Borden v. United States*, 141 S. Ct. 1817 (2021), holding that the elements clause in the Armed Career Criminal Act, 18 U.S.C. § 924(e)(2)(B)(i) — a clause that is materially identical to the one at issue in this case[26] — does not encompass crimes with a mens rea of recklessness. *See Borden*, 141 S. Ct. at 1821. Justice Kagan, who authored the plurality opinion in *Borden*,[27] reasoned that subsection 924(e)(2)(B)(i)'s use of the "phrase 'against another,' when modifying the 'use of force,' demands that the perpetrator direct his action at, or target, another individual." *Id.* at 1825.

The *Borden* decision likely applies to the materially identical elements clause at issue in this case. Because Rudolph's conviction for the predicate § 844(i) arson offense alleged in Count One required proof that he acted "maliciously" — a mens

---

[26] See note 4, *supra*, recording that the elements clause of the Armed Career Criminal Act defines "violent felony" as meaning "any crime punishable by imprisonment for a term exceeding one year . . . that . . . has as an element the use, attempted use, or threatened use of physical force against the person of another[.]" 18 U.S.C. § 924(e)(2)(B)(i).

[27] Justice Thomas concurred solely in the judgment. *See Borden*, 141 S. Ct. at 1834–37 (Thomas, J., concurring).

rea that "includes both intentional and reckless acts"[28] — it cannot be considered a "crime of violence" under the elements clause of 18 U.S.C. § 924(c)(3)(A),[29] which unquestionably requires a mens rea of intent or knowledge: that is, "of purposeful or knowing conduct"[30] in the use of physical force against the person or property of *another individual*. "Reckless conduct is not aimed in that prescribed manner." *Borden,* 141 S. Ct. at 1825.

### d. "*Against the person or property of another*"

Even if the Supreme Court had decided *Borden* differently, arson still would not qualify as a crime of violence under subsection 924(c)(3)(A)'s elements clause. As Deputy Solicitor General Eric J. Feigin noted during oral argument in *Borden*, the requirement for proof that the predicate "crime of violence" was one in which physical force was used "against the person or property of another" means that "arson does not qualify as a crime of violence under . . . [subsection 924(c)(3)(A)'s elements clause], because you can commit it by burning down your own house for the insurance money." Transcript of Oral Argument at 42, *Borden v. United States*, No. 19-5410 (Nov. 3, 2020) (alteration and ellipsis supplied).

---

[28] *United States v. Tsarnaev*, 968 F.3d 24, 101 (1st Cir. 2020).

[29] As stated before, § 924(c)(3)(A)'s elements clause defines "crime of violence" as "an offense that is a felony and . . . has as an element the use, attempted use, or threatened use of physical force against the person or property of another."

[30] *Borden*, 141 S. Ct. at 1828.

24

Many courts have applied the categorical approach to reach the same conclusion: that is, 18 U.S.C. § 844(i) is not a crime of violence as defined by the elements clause in 18 U.S.C. § 924(c)(3)(A), because that clause requires the "use, attempted use, or threatened use of physical force against the person or property *of another*"; *and*, as long as the property that was destroyed by fire or an explosion was used in interstate commerce, arson can be committed by a defendant against his own property. *See, e.g.*, *In re Franklin*, 950 F.3d 909, 911 (6th Cir. 2020) (granting § 2255 motion based on *Davis* because § 844(i) arson can be committed against the defendant's own property and, therefore, does not fall under the elements clause of subsection 924(c)(3)(A)); *United States v. Salas*, 889 F.3d 681, 684 (10th Cir. 2018) (vacating § 924(c) conviction and remanding for resentencing on § 844(i) because arson is not a "crime of violence" under the elements clause); *United States v. Moore*, 802 F. App'x 338, 342 (10th Cir. 2020) (same); *Hammond v. United States*, No. 3:19-cv-00544-KDB, 2019 WL 5295703, at *2–3 (W.D. N.C. Oct. 18, 2019) (same); *United States v. Lecron*, No. 3:19CR4, 2019 WL 2774297, at *4–5 (N.D. Ohio July 2, 2019) (same); *United States v. Garcia*, No. 2:11-cr-00290-TLN, CKD, 2019 WL 95509, at *1–2 (E.D. Cal. Jan. 3, 2019) (same); *Evey v. United States*, No. 2:16-cv-08900-SVW, 2018 WL 6133407, at *6 (C.D. Cal. May 10, 2018) (same).

The Government responded to this portion of Rudolph's argument in only a

cursory manner, because it is clear that the § 844(i) arson statute can apply to defendants who burn or bomb their own property. *See, e.g.*, *Russell*, 471 U.S. at 859 (involving prosecution, under 18 U.S.C. § 844(i), of a defendant who attempted to set fire to an apartment building that he owned); *United States v. Flaherty*, 76 F.3d 967, 974 (8th Cir. 1996) (upholding application of § 844(i) where owner of burger and malt shop committed arson at his own place of business in order to perpetrate insurance fraud); *United States v. Parsons*, 993 F.2d 38, 41 (4th Cir. 1993) (upholding conviction under § 844(i) against defendant who burned down her own home, which was being used as rental property, for insurance proceeds). As demonstrated by the foregoing decisions, that interpretation of the arson statute was true at the time Rudolph was convicted.

      **e.**    *Summary of the analysis of § 844(i) arson under the categorical approach*

In summary, even though Rudolph intentionally committed his crime against the property of another, the court is required by the categorical approach to look to the broadest conception of the crime, which, in the case of arson, includes an act recklessly committed against the defendant's own property. Therefore, Rudolph's arson conviction could not have qualified as a "crime of violence" under the elements clause of 18 U.S.C. § 924(c)(3)(A).

In another case, perhaps, this would be the end of the inquiry, and the sentence for the offense alleged in Count Two would be vacated as having been based upon the residual clause of subsection 924(c)(3)(B) that was declared unconstitutionally vague in *Davis*, *supra*. Here, however, the court also must ask whether, under the terms of his binding plea agreement, Rudolph gave up his right to file this § 2255 motion in the first place.

**D.     Direct Appeal and Collateral Attack Waivers**

A defendant's waiver of his right to appeal or collaterally attack a sentence is valid if the waiver is made knowingly and voluntarily. *Williams v. United States*, 396 F.3d 1340, 1341 (11th Cir. 2005). To establish that a waiver was made knowingly and voluntarily, the Government must show either (1) that the district court specifically questioned the defendant about the waiver during the plea colloquy, or (2) that the record makes it manifestly clear that the defendant otherwise understood the full significance of the waiver. *Id.*; *see also United States v. Bushert*, 997 F.2d 1343, 1351 (11th Cir. 1993). When a waiver is entered into knowingly and voluntarily, and contains express language relinquishing the right of collateral review, it is enforceable and precludes the defendant from collaterally attacking his sentence. *Williams*, 396 F.3d at 1342.

Rudolph's plea agreement included three provisions that explicitly

27

acknowledged his understanding that, by entering pleas of guilty to both counts of the

Superseding Indictment, he waived his rights to directly appeal and collaterally attack

his convictions and sentences. The first such acknowledgment was contained in

paragraph 2, reading as follows:

> 2. The defendant understands that by pleading guilty, he is giving up the right to plead not guilty and the right to be tried by a jury. At a trial, the defendant would have the right to an attorney. If the defendant could not afford an attorney, the Court would appoint one to represent the defendant. During the trial, the defendant would be presumed innocent and the Government would have the burden of proving him guilty beyond a reasonable doubt. The defendant would have the right to confront and cross-examine the witnesses against him. If the defendant wished, he could testify on his own behalf and present evidence in his defense, and he could subpoena witnesses to testify on his behalf. If, however, the defendant did not wish to testify, that fact could not be used against him. *If the defendant were found guilty after a trial, he would have the right to appeal the conviction. The defendant understands that by pleading guilty*, *he is giving up all of these rights* and there will not be a trial of any kind. *The defendant also understands that he ordinarily would have the right to appeal his sentence and, under some circumstances, to attack the sentence in post-conviction proceedings. By entering this Plea Agreement, the defendant is waiving those rights to appeal or collaterally attack his sentence, as specified in paragraph 13 below.* Finally, the defendant understands that, to plead guilty, he may have to answer questions posed to him by the Court concerning the rights that he is giving up and the facts of this case, and the defendant's answers, if untruthful, may later be used against him in a prosecution for perjury or false statements.

Criminal Case No. CR-00-S-0422-S, doc. no. 537 (Plea Agreement), ¶ 2, at 1–2

(emphasis supplied).

The second, more explicit acknowledgment was found in paragraph 13, reading as follows:

> 13. **WAIVER OF APPEAL**: In consideration of the Government's recommended disposition, the defendant voluntarily and expressly waives, *to the maximum extent permitted by federal law*, the right to appeal his conviction and sentence in this case, and the right to collaterally attack his sentence in any post-conviction proceeding, including a motion brought under 28 U.S.C. § 2255 or 18 U.S.C. § 3771, *on any ground*.

*Id*. ¶ 13, at 5 (boldface emphasis in original, italicized emphasis supplied).

The third acknowledgment was found in the following, unnumbered paragraph on page 7 of the Plea Agreement, below which Rudolph inscribed his signature and the date on which he executed the agreement:

> I have read the Indictment against me and have discussed it with my attorney. I understand the charges and the elements of each charge that the Government would have to prove to convict me at a trial. I have read the foregoing Plea Agreement and have carefully reviewed every part of it with my attorney. I understand the terms and conditions contained in the Plea Agreement, and I voluntarily agree to them. **I also have discussed with my attorney the rights I may have to appeal or challenge my sentence, and I understand that the appeal waiver contained in the Plea Agreement will prevent me, to the maximum extent permitted by federal law, from appealing my conviction or sentence or challenging my sentence in any post-conviction proceeding**. No one has threatened or forced me to plead guilty, and no promises or inducements have been made to me other than those discussed in the Plea Agreement. The discussions between my attorney and the Government toward reaching a negotiated plea in this case took place with my permission. I am fully satisfied with the representation provided to me by my attorney in this case.

29

*Id*. at 7 (boldface emphasis in original).

In addition, this court specifically questioned Mr. Rudolph about his understanding of the last two waivers during the plea colloquy conducted in open court on April 13, 2005.

> THE COURT: Mr. Rudolph, I want you to look at Paragraph Number 13 of your plea agreement, which appears on Page 5. That paragraph begins with all caps, bold-faced words, "Waiver of Appeal" [and reads as follows]:
>
>> "In consideration of the Government's recommended disposition, the defendant voluntarily and expressly waives, to the maximum extent permitted by federal law, the right to appeal his conviction and sentence in this case, and the right to collaterally attack his sentence in any post-conviction proceeding, including a motion brought under Title 28, United States Code, Section 2255 or Title 18, United States Code, Section 3771, on any ground."
>
> I also would like for you to look at the last unnumbered paragraph of your plea agreement that is found on page 7. That paragraph appears immediately above the first signature I asked you to identify this morning [*i.e.*, Rudolph's own signature]. And I want you to read the bold-faced text of that paragraph.
>
>> "**I also have discussed with my attorney the rights I may have to appeal or challenge my sentence, and I understand that the appeal waiver contained in the Plea Agreement will prevent me, to the maximum extent permitted by federal law, from appealing my conviction or sentence or challenging my sentence in any post-conviction proceeding**."
>
> Did you read both of the portions of your plea agreement that I

30

just quoted before you signed the document?

      THE DEFENDANT:  Many times, Your Honor.

      THE COURT:  Did you discuss those portions of your plea agreement with your attorneys before you signed the document?

      THE DEFENDANT:  I did, Your Honor.

      THE COURT:  And do you clearly understand that by executing this plea agreement and entering your two pleas of guilty, you will have waived or given up your right to appeal your conviction, your sentences, as well as your right to challenge your sentences in any post-conviction proceeding?

      THE DEFENDANT:  Yes, I understand.

      THE COURT:  Ms. Clarke, did you fully discuss those portions of the plea agreement with Mr. Rudolph before he signed the document?

      MS. CLARKE:  Yes.

      THE COURT:  Do you believe that he understands the significance of his appeal waivers?

      MS. CLARKE:  I do.

      THE COURT:  And do you concur with Mr. Rudolph's decision to execute those waivers?

      MS. CLARKE:  Yes, I do.

Criminal Case No. CR 00-S-0422-S, doc. no. 543 (Transcript of Plea Colloquy), at

20–22 (bracketed text supplied).

      The three provisions of the plea agreement quoted above, and the foregoing

31

plea colloquy, demonstrate that Mr. Rudolph knowingly and voluntarily waived, "*to the maximum extent permitted by federal law*, the right to . . . collaterally attack his sentence in any post-conviction proceeding . . . *on any ground*."  Criminal Case No. CR 00-S-0422-S, doc. no. 537 (Plea Agreement), ¶ 13, at 5 (emphasis supplied). *See also id.* at 7 (unnumbered paragraph) (same).

The Eleventh Circuit has long enforced appeal and collateral attack waivers that are knowingly and voluntarily made according to their specific terms. *See, e.g.*, *United States v. Brown*, 415 F.3d 1257, 1272 (11th Cir. 2005); *United States v. Frye*, 402 F.3d 1123, 1129 (11th Cir. 2005); *Williams*, 396 F.3d at 1342; *United States v. Weaver*, 275 F.3d 1320, 1333 (11th Cir. 2001); *United States v. Pease*, 240 F.3d 938, 942 (11th Cir. 2001); *United States v. Buchanan*, 131 F.3d 1005, 1008 (11th Cir. 1997).  *See also United States v. Rubbo*, 396 F.3d 1330, 1334 (11th Cir. 2005) ("Plea bargains . . . are like contracts and should be interpreted in accord with what the parties intended.").

Rudolph argues, nevertheless, that the collateral attack waivers contained in his Plea Agreement do not bar his *Davis* challenge because he is attacking his *conviction*, as opposed to his *sentence*,[31] and, his conduct no longer falls into the definition of the crime charged in Count Two.

---

[31] *See* doc. no. 14 (Petitioner Rudolph's Reply), at 3-7.

### 1. Collaterally attacking a *conviction*, but not a *sentence*

Rudolph first argues that the provisions in his Plea Agreement waiving "the right to *appeal* his *conviction and sentence . . .* and the right to *collaterally attack* his *sentence* in any post-conviction proceeding"[32] do not bar him from collaterally attacking his *conviction. See* doc. no. 14 (Petitioner Rudolph's Reply), at 4 (citing *United States v. Palmer*, 456 F.3d 484, 488 (5th Cir. 2006) ("A defendant's waiver of his right to appeal a sentence is just that: it does not also constitute a waiver of his right to challenge a conviction."); *Cowart v. United States*, 139 F. App'x 206, 208 (11th Cir. 2005) ("[T]he language of Cowart's sentence appeal waiver provided that she waived her right 'to collaterally attack her sentence,' and did not mention a waiver of the right to attack her plea or the plea agreement itself [and therefore] Cowart's valid sentence-appeal waiver does not preclude these issues.") (alterations supplied); *United States v. Copeland*, 381 F.3d 1101, 1105 (11th Cir. 2004) (holding that waiver of "right to appeal any sentence imposed" did not bar defendant from appealing on grounds that government breached plea agreement); *Allen v. Thomas*, 161 F.3d 667, 671 (11th Cir. 1998) (holding that agreement not to seek "parole, commutation of sentence, reprieve, or any other form of relief from life imprisonment" did not bar defendant from seeking federal habeas review of

---

[32] Criminal Case No. CR-00-S-0422-S, doc. no. 537 (Plea Agreement), ¶ 13, at 5.

underlying convictions because it referred "to a reduction of the sentence, not to relief from the underlying conviction itself'")). Rudolph also argues, based upon the same passages, that the court did not adequately inform him that he was waiving his right to *collaterally attack* his *conviction*.[33]

Rudolph is wrong. It is not possible to collaterally attack only a *conviction* under 28 U.S.C. § 2255, which provides an avenue to attack the defendant's *sentence*. Specifically, that statute provides that:

> A prisoner in custody under *sentence* of a court established by Act of Congress claiming the right to be released upon the ground that the *sentence* was imposed *in violation of the Constitution* or laws of the United States, or that the court was without jurisdiction to impose such *sentence*, or that the *sentence* was in excess of the maximum authorized by law, or is otherwise subject to collateral attack, may move the court which imposed the *sentence* to vacate, set aside or correct the *sentence*.

28 U.S.C. § 2255(a) (emphasis supplied). The focus of that provision is entirely on a defendant's sentence, and the ability to attack that sentence while still serving it.

The next subsection of that statute permits a court to also vacate a defendant's judgment of conviction, and to then either "discharge the prisoner" or "grant a new

---

[33] There is nothing in the record that suggests Rudolph did not understand the waiver clause at the time of his conviction and sentencing. *See* Criminal Case No. CR 00-S-0422-S, doc. no. 543 (Transcript of Plea Colloquy), at 21–22 ("And do you clearly understand that by executing this plea agreement and entering your two pleas of guilty, you will have waived or given up your right to appeal your conviction, your sentences, *as well as your right to challenge your sentences in any post-conviction proceeding*?"); *see also United States v. Bushert*, 997 F.2d 1343, 1350 (11th Cir. 1993) (holding that a waiver is unenforceable unless "the district court specifically questioned the defendant" about the waiver, or "it is manifestly clear from the record that the defendant otherwise understood the full significance of the waiver").

trial." 28 U.S.C. § 2255(b). However, any relief as to the underlying conviction is granted only as a result of a successful challenge to the sentence imposed. In other words, in order for Rudolph to collaterally attack his *conviction*, he first must attack his *sentence*, which he waived his right to do.

Rudolph recognized that limitation when framing his initial, *pro se* motion as a "motion to vacate his § 924(c) *sentence* pursuant to 28 U.S.C. § 2255 in light of *U.S. v. Davis*." Doc. no. 1 (Pro Se Motion to Vacate), at 1 (formatting modified, emphasis supplied). Rudolph correctly explained in his initial, *pro se* pleading that this court had jurisdiction over his motion because he is "held in custody as a result of sentences imposed by this court." *Id.* at 2. He then argued that the sentence imposed for the offense of conviction alleged in Count Two could not be maintained in light of *Davis*, and that, under the "sentence package doctrine," he also should be resentenced for the arson offense in Count *One*. *See id.* at 3. The pleading subsequently filed by Rudolph's appointed counsel also invoked that same doctrine to ask that Rudolph be resentenced as to Count *One* if the court vacated his sentence on Count *Two*. *See* doc. no. 14 (Petitioner Rudolph's Reply), at 29.

None of the cases cited by Rudolph or his appointed attorneys contradict his original assertion that he was moving to vacate his *sentence*, nor do any support his new argument that he is collaterally attacking *only* his *conviction*. The Fifth Circuit

held in *United States v. Palmer*, 456 F.3d 484, 488 (5th Cir. 2006), that a sentence-appeal waiver did not equate to a waiver of the right to directly appeal *a conviction*. A direct appeal differs from a § 2255 motion, however, because a defendant may bring an appeal of any "final decision" of the court, *see* 28 U.S.C. § 1291, but a motion under § 2255 may be brought only by someone "in custody under sentence of a court" who is collaterally attacking the sentence that keeps them there. Each of the defendants in the other cases cited by Rudolph — *i.e.*, *Cowart v. United States*, 139 F. App'x 206, 208 (11th Cir. 2005); *United States v. Copeland*, 381 F.3d 1101, 1105 (11th Cir. 2004); and *Allen v. Thomas*, 161 F.3d 667, 671 (11th Cir. 1998) — sought, unlike Rudolph, to attack a portion of their plea, conviction, or sentence which they did not explicitly waive their right to attack.

For all of the foregoing reasons, Rudolph's argument that he is attacking only his *conviction*, but not his *sentence*, is not persuasive.

### 2. The contention that Rudolph's conduct no longer fits the definition of the crime charged in Count Two

Rudolph also argues that his collateral attack waiver is not enforceable against his *Davis* claim because "his conduct [no longer falls] within the definition of the charged crime." *United States v. Hildenbrand*, 527 F.3d 466, 474 (5th Cir. 2008) (alteration supplied). Rudolph contends that, when he pled guilty in 2005, it was

36

"with the understanding that 18 U.S.C. § 924(c)'s residual clause was valid and enforceable and that his conduct fell within its prohibitions." Doc. no. 14 (Petitioner Rudolph's Reply), at 7. After the Supreme Court rendered its decision in *Davis*, however, his conduct no longer supports such a conviction. Therefore, he argues, the court has imposed "a penalty for a crime beyond that which is authorized by statute," and it must be vacated. *Bushert*, 997 F.2d at 1350 n.18.

Rudolph's argument does not withstand close scrutiny, because it ignores the fact that his conviction for the offense charged in Count Two and its corresponding sentence were valid *in 2005*. "[A] voluntary plea of guilty intelligently made *in light of the then applicable law* does not become vulnerable because later judicial decisions indicate that the plea rested on a faulty premise." *Brady v. United States*, 397 U.S. 742, 757 (1970) (alteration and emphasis supplied). *See also, e.g.*, *United States v. Sahlin*, 399 F.3d 27, 31 (1st Cir. 2005) ("[T]he possibility of a favorable change in the law occurring after a plea is one of the normal risks that accompany a guilty plea.") (alteration supplied); *United States v. Morgan*, 406 F.3d 135, 137 (2d Cir. 2005) ("[T]he possibility of a favorable change in the law after a plea is simply one of the risks that accompanies pleas and plea agreements.") (alteration supplied); *United States v. Lockett*, 406 F.3d 207, 214 (3d Cir. 2005) ("The possibility of a favorable change in the law occurring after a plea agreement is merely one of the

37

risks that accompanies a guilty plea."); *United States v. Archie*, 771 F.3d 217, 222 (4th Cir. 2014) ("If we declined to enforce [the defendant's] appeal waiver because of a subsequent change in the law, we would deprive the Government of the benefit of its bargain and frustrate the purpose underlying such contracts.") (alteration supplied); *United States v. Burns*, 433 F.3d 442 (5th Cir. 2005) (enforcing appeal waiver against challenge based on change in law); *United States v. Bradley*, 400 F.3d 459, 463 (6th Cir. 2005) ("[W]here developments in the law later expand a right that a defendant has waived in a plea agreement, the change in law does not suddenly make the plea involuntary or unknowing or otherwise undo its binding nature."); *United States v. Killgo*, 397 F.3d 628, 629 n.2 (8th Cir. 2005) ("The fact that Killgo did not anticipate the *Blakely* or *Booker* rulings does not place the issue outside the scope of his waiver."); *United States v. Porter*, 405 F.3d 1136, 1145 (10th Cir. 2005) ("To allow defendants or the government to routinely invalidate plea agreements based on subsequent changes in the law would decrease the prospects of reaching an agreement in the first place, an undesirable outcome given the importance of plea bargaining to the criminal justice system."); *United States v. Masilotti*, 565 F. App'x 837, 839 (11th Cir. 2014) ("[A] knowing and voluntary waiver is valid and enforceable against claims based on subsequent changes in the law unless a provision in the plea agreement states otherwise.").

38

Rudolph's argument also ignores the fact that the Eleventh Circuit has consistently enforced waivers of appeal and collateral attack rights against *constitutional challenges*. *See, e.g.*, *United States v. Bascomb*, 451 F.3d 1292, 1297 (11th Cir. 2006) (citing *Brown*, 415 F.3d at 1272).

Most importantly, the Eleventh Circuit has upheld an appeal waiver against a *Davis* challenge. *See United States v. Joseph*, 811 F. App'x 595, 598 (11th Cir. 2020) (*per curiam*);[34] *see also United States v. Buckner*, 808 F. App'x 755, 765 (11th Cir. 2020) (enforcing appeal waiver as to claim that defendant was improperly classified as career offender). It follows that the Eleventh Circuit likely would uphold a collateral-attack waiver against a *Davis* challenge.[35]

Other circuit courts also have upheld appeal and collateral attack waivers

---

[34] The plea agreement in *Joseph* contained a provision waiving the defendants' right "to assert any claim that (1) the statutes to which the defendant is pleading guilty are unconstitutional; and/or (2) the admitted conduct does not fall within the scope of the statutes of conviction." *United States v. Joseph*, 811 F. App'x 595, 598 (11th Cir. 2020). The specificity of that waiver does not change the analysis in the present case because the Eleventh Circuit has consistently held that defendants are "free to bargain away [their rights] to raise constitutional issues as well as non-constitutional ones." *United States v. Bascomb*, 451 F.3d 1292, 1297 (11th Cir. 2006) (so holding where the appeal waiver did not contain a specific waiver of constitutional challenges).

[35] The instances where the Court has held differently involved appeal waivers with explicit exceptions for sentences in excess of the statutory maximum. *See United States v. Cilla*, 712 F. App'x 880, 883–84 (11th Cir. 2017) (holding *Johnson* argument not barred by appeal waiver because of the exception for sentences in excess of the statutory maximum); *United States v. Rosales-Acosta*, 679 F. App'x 860, 861 (11th Cir. 2017) (*per curiam*) (holding that the appeal waiver did not preclude a challenge to an Armed Career Criminal Act enhancement). There are no exceptions to Rudolph's waiver of appeal or collateral attack.

against *Davis* and other similar challenges.[36]  Most relevantly, the Seventh Circuit

ruled on the enforceability of a collateral attack waiver against a *Davis* challenge in

*Oliver v. United States*, 951 F.3d 841 (7th Cir. 2020).  In that case, two defendants

had entered guilty pleas for, among other charges, use of a firearm during a crime of

violence in violation of 18 U.S.C. § 924(c).  Each of their plea agreements contained

the following clause:

> I expressly waive my right to appeal or contest my conviction and my
> sentence or the manner in which my conviction or my sentence was
> determined or imposed, *to any Court on any ground*, including any
> claim of ineffective assistance of counsel unless the claimed ineffective
> assistance of counsel relates directly to this waiver or its negotiation,
> *including any appeal . . . or any post-conviction proceeding, including*
> *but not limited to, a proceeding under Title 28, United States Code,*
> *Section 2255 . . . .*

---

[36] *See, e.g.*, *United States v. Terry*, 788 F. App'x 933, 934 (4th Cir. 2020) (enforcing appeal waiver against *Davis* challenge); *United States v. Worthen*, 842 F.3d 552, 555–56 (7th Cir. 2016) (enforcing waiver against challenge to § 924(c) "crime of violence" designation); *United States v. Posada-Cardenas*, No. 20-cv-01086-CMA, 2020 WL 6585798, at *2 (D. Colo. Nov. 10, 2020) (enforcing collateral attack waiver against *Davis* challenge); *Gallardo v. United States*, No. 18-cv-802 KWR-JFR, 2020 WL 1495740, at *3 (D. N.M. Mar. 27, 2020) (recognizing enforceability of collateral attack waiver against *Davis* challenge); *Davis v. United States*, No. 19-22263-CV-MOORE, 2019 WL 11343401, at *6 (S.D. Fla. Sept. 20, 2019) (enforcing appeal waiver against *Davis* challenge); *Kendall v. United States*, No. 1:18-cv-00108-GNS, 2019 WL 1786870, at *3 (W.D. Ky. Apr. 24, 2019) (enforcing collateral attack waiver against *Dimaya* claim); *Weeks v. United States*, No. C18-5618RBL, 2019 WL 1489169, at *2–3 (W.D. Wash. Apr. 3, 2019) (enforcing waiver against *Dimaya* challenge); *Lee v. United States*, No. CV-16-08138-PCT-JAT, 2018 WL 4899567, at *3 (D. Ariz. Oct. 9, 2018) (enforcing collateral attack waiver against *Johnson* claim); *Brown v. United States*, No. 1:16-cv-2136-WSD, 2016 WL 7367751, at *1–2 (N.D. Ga. Dec. 20, 2016) (enforcing waiver against challenge to § 924(c) sentence); *McKenzie v. United States*, No. 2:09-cv-340-MHT(WO), 2011 WL 2836758, at *3 (M.D. Ala. May 25, 2011) (enforcing waiver against actual innocence claim based on novel Supreme Court decisions); *Claudio v. United States*, No. 8:03-cr-254-T-17TGW, 2008 WL 2116928, at *3 (M.D. Fla. May 19, 2008) (enforcing waiver, even against constitutional challenge).

*Id.* at 843 (emphasis supplied). During the plea colloquy, the district court emphasized that "on any ground" included challenges alleging the conviction or sentence was "in violation of the Constitution." *Id.*

Despite the waivers, the defendants moved under 28 U.S.C. § 2255 to vacate their convictions under 18 U.S.C. § 924(c) on the grounds that the residual clause was unconstitutionally vague. The Seventh Circuit held that the defendants' collateral attack waivers were enforceable because they did not fall within the "few narrow and rare" grounds the Seventh Circuit had previously recognized for not enforcing a "voluntarily and effectively-counseled waiver of direct appeal *or collateral review*."[37] *Oliver*, 951 F.3d at 844 (emphasis supplied). The Seventh Circuit has "consistently rejected arguments that an [express] appeal waiver is invalid because the defendant did not anticipate subsequent legal developments." *Id.* at 845 (quoting *United States v. McGraw*, 571 F.3d 624, 631 (7th Cir. 2009)) (alteration in original). Appeal and collateral attack waivers in plea agreements are favored because they effectively "allocate the risk of the unknown for both sides." *Id.*

The *Oliver* defendants argued that their challenge was "non-waivable" because the statute upon which they were convicted now was facially unconstitutional. *See*

---

[37] Those "few narrow and rare grounds" are: the district court relying on a "constitutionally impermissible factor" like race or gender, the sentence exceeding the statutory maximum; or the proceedings lacking a "minimum of civilized procedure." *Oliver v. United States*, 951 F.3d 841, 844 (7th Cir. 2020).

*Class v. United States*, 138 S. Ct. 798, 805 (2018) (holding that a "valid guilty plea does not, *by itself*, bar direct appeal of . . . constitutional claims") (emphasis and ellipsis added). The *Class* decision did not, however, invalidate appeal and collateral attack waivers,[38] and the Seventh Circuit, like the Eleventh Circuit, has repeatedly held "that a defendant's freedom to waive his appellate rights includes the ability to waive his right to make constitutionally-based appellate arguments." *United States v. Smith*, 759 F.3d 702, 707 (7th Cir. 2014); *see also Bascomb*, 451 F.3d at 1297.

This court finds the Seventh Circuit's disposition in *Oliver*, in combination with the Eleventh Circuit precedent discussed above, to be persuasive in holding that Rudolph's collateral attack waiver is enforceable against his *Davis* challenge.

Rudolph, having knowingly and voluntarily waived his right to collaterally attack his sentence on any ground, may not now have his sentence vacated. As in any contract, the parties allocated the risks, and gave proper consideration. The Government agreed not to pursue the death penalty and, in return, Rudolph agreed not to appeal his convictions or sentences, or to collaterally attack his sentences. This court will enforce that agreement according to its terms.

## V. CONCLUSION

Based upon the foregoing discussion, Rudolph's 28 U.S.C. § 2255 motion is

---

[38] *See, e.g.*, *United States v. Lloyd*, 901 F.3d 111, 124 n.11 (2d Cir. 2018) (holding that *Class* did not render broad appeal waivers invalid).

due to be denied.  An appropriate judgment will be entered contemporaneously herewith.

     **DONE** this 29th day of July, 2021.

                                                   _____

                                               Senior United States District Judge